# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **OPTIONMONSTER HOLDINGS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 10 C 2792** |
| ) | |
| **TAVANT TECHNOLOGIES, INC.,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff OptionMonster Holdings, Inc.'s (OptionMonster) motion for a preliminary injunction. For the reasons stated below, we grant the motion for a preliminary injunction.

## BACKGROUND

OptionMonster alleges that it hired Defendant Tavant Technologies, Inc. and Defendant Tavant Technologies, India, Private Ltd. (collectively referred to as "Tavant") to develop certain aspects of the OptionMonster Brokerage System (System), an online trading platform. To facilitate the development of the System (Project), OptionMonster allegedly shared its proprietary and trade secret

1

information with Tavant and Defendant Abey Tom, Defendant Bhargava Narayana,

Defendant Devesh Raghubanshi, Defendant Khajamiya Mohammad, Defendant

Mehrubanu Thoombath, Defendant Mohammad Bilal, Defendant Mohammad Rashid

, Defendant Mohneesh Singh, Defendant Muralidhar Polavarapu, Defendant Niju

Ninan Pothan, Defendant Praveen Kumar, Defendant R. Jyothi, Defendant R. Nirmal

Kumar, Defendant Rachita Roy, Defendant Sridevi Itla, and Defendant B. Uma

Gandhi (collectively referred to as "Individual Defendants"). OptionMonster's

proprietary and trade secret information was allegedly protected by a Software

System Development and Support Services Agreement (Services Agreement) entered

into by Tavant, and by various confidentiality agreements entered into by Individual

Defendants (Individual Agreements) (Services Agreement and Individual

Agreements collectively referred to as "Agreements").

      Pursuant to the Agreements, Defendants agreed that the employees working

on the Project (Project Staff) would be segregated from all other Tavant employees.

Defendants also agreed under an non-assignment provision (Non-Assignment

Provision) that none of the Project Staff would be assigned to any projects performed

for any competitor of OptionMonster (Competitor) for at least eighteen months after

the employee completed work on the Project. In addition, Defendants agreed that

OptionMonster's proprietary and trade secret information would be deleted or

destroyed as Project Staff completed their work on the Project.

OptionMonster alleges that in December 2009, after becoming concerned that Defendants were violating the Agreements, OptionMonster reviewed Tavant's marketing presentation to other online brokerage companies. According to OptionMonster, the presentation confirmed that Tavant was using OptionMonster's proprietary and trade secret information to solicit business from Competitors. OptionMonster also alleges that one of OptionMonster's employees, Sanjib Sahoo (Sahoo), visited Tavant's facilities in Bangalore, India around that same time, and allegedly saw a demonstration of another trading project being developed by Tavant. After Sahoo allegedly saw the demonstration, OptionMonster allegedly requested that Tavant reconfirm that Defendants were abiding by the terms of the Agreements. According to OptionMonster, Tavant made misrepresentations to OptionMonster at that time indicating that Defendants were in compliance with the Agreements.

OptionMonster allegedly continued to make inquiries regarding Defendants' compliance with the Agreements, and on March 17, 2010, Tavant allegedly admitted that certain Individual Defendants had been assigned to projects for Competitors in violation of the Agreements. OptionMonster claims that, as a result of Tavant's alleged admission, OptionMonster directed Tavant to conclude the work being performed for OptionMonster in Bangalore, India. OptionMonster also allegedly

advised Tavant that OptionMonster would conduct an audit in Bangalore from April 12-16, 2010, to confirm that Defendants had deleted or destroyed all information relating to OptionMonster's proprietary information and trade secrets. OptionMonster states that when it conducted the audit, OptionMonster allegedly found that Defendants had not deleted or destroyed OptionMonster's proprietary information and trade secrets, and also found additional evidence indicating that the Project had not been segregated from other projects being performed for Competitors. OptionMonster further alleges that Defendant Mohammad Rashid opened an OptionMonster account solely for the purpose of misappropriating OptionMonster's proprietary information and trade secrets.

On May 5, 2010, OptionMonster brought the instant action seeking damages and injunctive relief. OptionMonster's complaint includes a claim for breach of contract brought against Tavant (Count I), claims for breach of contract brought against Individual Defendants (Count II), claims for violations of the Illinois Trade Secrets Act (ITSA), 765 ILSC § 1065 *et seq.*, brought against all Defendants (Count III), claims for violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030 *et seq.*, brought against Tavant and Rashid (Count IV), a claim for violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, brought against Tavant (Count V), and a claim for unjust enrichment brought against Tavant (Count VI).

On May 6, 2010, OptionMonster filed a motion for a temporary restraining order and a motion for a preliminary injunction based upon OptionMonster's breach of contract and ITSA claims. At a hearing on OptionMonster's motion for a temporary restraining order, held May 7, 2010, Defendants agreed to maintain the status quo until the court ruled on OptionMonster's motion for a preliminary injunction.

According to OptionMonster, Defendants have breached the Agreements and used OptionMonster's proprietary and trade secret information to develop products for Competitors. In addition, OptionMonster states that Defendants are immediately poised to deliver products to Competitors that contain or were developed using OptionMonster's confidential information and trade secrets. To preserve the status quo during the pendency of this proceeding, OptionMonster has come before this court requesting that, until the resolution of the instant action, the court prohibit Defendants from marketing or delivering such products and from further using OptionMonster's proprietary information and trade secrets in connection with Defendants' work for Competitors. OptionMonster contends that such relief is necessary to prevent "severe and irreparable harm to OptionMonster's competitive advantage in the online options trading marketplace." (P Mot. 9). OptionMonster moves for a preliminary injunction on its breach of contract and ITSA claims. On

May 25, 2010, the court held a preliminary injunction hearing, at which the parties presented documentary evidence and arguments addressing OptionMonster's motion for a preliminary injunction.

**LEGAL STANDARD**

A preliminary injunction will be granted when "the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Illinois Dept. of Financial and Professional Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). In order to obtain a preliminary injunction, a plaintiff must show that: "(1) [the plaintiff] ha[s] a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) [the plaintiff] will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the defendant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *Goodman*, 430 F.3d at 437.

**DISCUSSION**

I. Reasonable Likelihood of Success on the Merits

OptionMonster claims that it is likely to succeed on the merits of its breach of contract and ITSA claims. To determine whether a plaintiff has a reasonable likelihood of success on the merits, the court must assess whether the plaintiff has "a

greater than negligible chance of winning . . . ." *AM General Corp. v.*

*DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002).  In addition, the required

showing by the plaintiff for the likelihood of success on the merits is lower if there is

"a greater predominance of the balance of harms."  *AM General*, 311 F.3d at 804; *see*

*also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549

F.3d 1079, 1086 (7th Cir. 2008)(stating that, during the balancing stage, "the court

employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less

heavily need the balance of harms weigh in his favor; the less likely he is to win, the

more need [the balance of harms] weigh in his favor'")(citations omitted).

Defendants argue that OptionMonster has not shown a likelihood of success on the

merits on the breach of contract claims or ITSA claims.


    A. Breach of Contract Claims

    Defendants do not dispute that they breached certain provisions of the

Agreements.  However, Defendants argue that OptionMonster cannot prevail on its

breach of contract claims because OptionMonster failed to substantially perform

under the contract and waived the confidentiality and Non-Assignment Provisions in

the Agreements.  To succeed on a breach of contract claim under Illinois law, a

plaintiff must show "(1) the existence of a valid and enforceable contract; (2)

substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Development, LLC v. National City Bank*, 592 F.3d 759, 764 (7th Cir. 2010)(citations omitted).

### 1. Substantial Performance

Defendants contend that OptionMonster has not substantially performed under the contract because OptionMonster solicited Tavant employees in breach of Section 16.1 of the Services Agreement (Section 16.1). A plaintiff has substantially performed under a contract where the plaintiff has "substantially complied with the material terms of the agreement attributable to him." *Allsopp Sand & Gravel, Inc. v. Lincoln Sand & Gravel Co.*, 525 N.E.2d 1185, 1188 (Ill. App. Ct. 1988). According to Defendants, Section 16.1 prohibited OptionMonster from soliciting or making job offers to Tavant employees until April 23, 2010. Defendants argue that prior to this litigation, OptionMonster had the same understanding of Section 16.1. In support of their argument, Defendants point to an email exchange between Sahoo and OptionMonster's Chief Executive Officer, Dirk Mueller (Mueller) from 2009 in which OptionMonster discusses paying Tavant a fee that was required under Section 16.2 of the Services Agreement (section 16.2) if they hired a Tavant employee who was planning to leave Tavant. (Mueller Auth. Aff. Ex. 42). In addition, Defendants

point to an email from Sahoo to Mueller stating that a start date of April 26, 2010 for former Tavant employees would "fit well with contract date [sic]." (Mueller Auth. Aff. Ex. 124). However, OptionMonster's attempts to substantially comply with Section 16.1 or with Section 16.2 are not dispositive as to OptionMonster's interpretation or intent with respect to the Services Agreement.

When interpreting a contract, the court gives unambiguous terms their "clear and ordinary meaning." *Reger Dev.*, 592 F.3d at 764 (citation omitted). In addition, the court "do[es] not look at any one contract provision in isolation," but instead "read[s] the document as a whole." *Id.* (citation omitted). Section 16 is entitled "Client Right to Employ Vendor Personnel." (Sahoo Aff. Ex. A 33-34). In addition, Section 16.1 states, that after the Services Agreement has been in effect for three years, "[Tavant] will . . . at [OptionMonster's] request" provide names of personnel, provide access to personnel, permit meetings with and solicitation of personnel, and allow the hiring of personnel. (Sahoo Aff. Ex. A 33-34). The plain and ordinary language of Section 16.1 thus creates an obligation for Tavant, as opposed to placing a prohibition on OptionMonster.

In addition, even if we construed Section 16.1 in the manner Defendants suggest, in other words, as imposing a duty upon OptionMonster to wait until April 23, 2010 to solicit or hire Tavant employees, the record at this juncture does not

show that OptionMonster failed to substantially comply with such a duty.

Defendants point to evidence in the record indicating that OptionMonster solicited at least one Tavant employee in 2008 and several others in March of 2010.  (D Opp. SR Ex. E 16).  However, the record also indicates that OptionMonster did not actually make any formal offers of employment to Tavant employees until the end of March 2010.  (D Opp. SR Ex. E 16).  In addition, the record indicates that four of the Tavant employees hired by OptionMonster requested that their last day working for Tavant be April 23, 2010, and that one other Tavant employee hired by OptionMonster indicated that his last day working for Tavant would be April 30, 2010, unless Tavant relieved him sooner.  (D Opp. SR Ex. D2).  Also, the record reflects that OptionMonster ensured that the effective dates of employment for all of Tavant's former employees was after April 23, 2010, the relevant date under Section 16.1 according to all parties.  Thus, there is sufficient evidence in the record at this juncture to indicate that OptionMonster substantially complied with Section 16.1 of the Services Agreement.  Further, we note that Individual Defendants were not party to the Services Agreement.  Therefore, Defendants' argument regarding OptionMonster's failure to substantially perform under the Services Agreement does not affect OptionMonster's breach of contract claims brought against Individual Defendants.  OptionMonster has pointed to sufficient evidence at this juncture to

show it substantially performed under the Agreements.

### 2. Waiver of Confidentiality and Non-Assignment Provisions

Defendants claim that OptionMonster had an opportunity to review and approve Tavant's marketing presentation. Defendants argue that OptionMonster's approval of Tavant's marketing presentation created a waiver of the confidentiality provisions and Non-Assignment Provisions in the Agreements. The record shows that OptionMonster objected to Tavant's inclusion of certain confidential information in Tavant's marketing presentation. (Sahoo Dep. 20:16, 21:4). Defendants argue that OptionMonster's approval of Tavant's revised marketing presentation means that OptionMonster cannot now claim that any information contained in the revised marketing presentation is confidential, proprietary, or a trade secret. However, even if there was such a waiver, the Services Agreement provides that "any waiver of a term or condition . . . in any one instance shall not be deemed or construed as a general waiver of such terms and conditions or a waiver of any subsequent breach." (Sahoo Aff. Ex. A 39). In addition, in support of their argument that OptionMonster approved the revised marketing presentation, Defendants point to one of OptionMonster's internal emails, which indicates only that certain OptionMonster employees believed the revised marketing presentation was acceptable. (D Opp. SR

Ex. U).  The record at this juncture, therefore, does not indicate whether

OptionMonster formally approved the revised presentation.

Further, the record indicates that during OptionMonster's consideration of the

revised marketing presentation, OptionMonster did not yet know that Defendants

were violating other confidentiality provisions or the Non-Assignment Provisions of

the Agreements.  (Sahoo Dep. 21:11-18, 40:21-41:22).  Thus, the OptionMonster's

supposed approval of the revised marketing presentation would not create a waiver

of the confidentiality provisions or Non-Assignment Provisions in the Agreements.

The record indicates that OptionMonster provided references to other

brokerage firms on behalf of Tavant.  Therefore, Defendants argue that

OptionMonster's willingness to provide references for Tavant to other retail

brokerage firms demonstrates that OptionMonster was well-aware of the work

Defendants were performing for Competitors.  However, OptionMonster's

knowledge of the type of work Defendants were performing does not create a waiver

of the confidentiality provisions or Non-Assignment Provisions in the Agreements.

OptionMonster has indicated that, when providing references, OptionMonster

assumed that Defendants had been complying with the confidentiality provisions or

Non-Assignment Provisions in the Agreements.  (Mueller Aff. Par. 30-31).  Further,

the record shows that OptionMonster provided references for Tavant prior to

December 2009, which was when OptionMonster allegedly began to suspect Defendants had breached the Agreements and misappropriated OptionMonster's trade secrets. (D Opp. SR Ex. A, N, O, P, Q, T). Therefore, OptionMonster's willingness to provide references prior to having concerns of violations by Tavant would not create a waiver of the confidentiality provisions or Non-Assignment Provisions in the Agreements.

As to the issue of Competitors of OptionMonster, the parties have disagreed as to whether Scotia iTrade (Scotia) is a Competitor, and thus as to whether the Non-Assignment Provisions of the contract would apply to any work for Scotia. Defendants point to lists of Competitors that OptionMonster provided to them during the course of the Project. (D. Opp. SR Ex. L, Mueller Auth. Aff. Ex. 102). However, the record indicates that OptionMonster informed Tavant that the lists provided were not exhaustive. (D. Opp. SR Ex. L). Defendants also argue that OptionMonster and Scotia do not currently directly compete since Scotia can only accept Canadian residents as customers. (D. Opp. SR Ex. M). The Services Agreement indicates that the term "Competitive Activity" includes "a business or activity that [Tavant] knows [OptionMonster] is planning to engage in, but in any event, including developing, providing, supporting (including application maintenance services), operating and/or otherwise engaging in (I) the business of

trading securities or other instruments (including internet-enabled securities trading), or (ii) a retail securities brokerage business. " (Sahoo Aff. Ex. A 7). In addition, both the Request for Proposal and the Services Agreement provide that one of the objectives of the Project was to implement the System in markets outside the United States. (Mueller Aff. Ex. I; Sahoo Aff. Ex. A). Further, the record reflects that OptionMonster identified Potential Competitors as "[a]ny company that plans to offer automated trading in the U.S. stocks and/or options to retail clients . . . [which] would include . . . any organizations that plan to enter a business that would require them to register with the Financial Industry Regulatory Association" in the United States. (Mueller Auth. Aff. Ex. 57). Thus, the record reflects that Scotia is properly characterized as a Competitor, and that the Non-Assignment Provisions of the Agreement apply to work done for Scotia.

At this juncture, OptionMonster has pointed to sufficient evidence to show that the Agreements are valid and enforceable, that OptionMonster substantially performed under the Agreements, that Defendants breached the Agreements, and that OptionMonster has suffered damages as a result. Based upon the above, OptionMonster has carried its burden of showing a likelihood of success on its breach of contract claims.

B.  ITSA Claims

Defendants argue that OptionMonster cannot prevail on its ITSA claims

brought against all Defendants because OptionMonster has not identified a

protectable trade secret and cannot show that Tavant ever used OptionMonster's

alleged trade secrets in doing work for Competitors.  To succeed on an ITSA claim, a

plaintiff must show that the "information at issue was a trade secret, that it was

misappropriated and that it was used in the defendant's business."  *Learning Curve*

*Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003); *System*

*Development Services, Inc. v. Haarmann*, 907 N.E.2d  63, 72 (Ill. App. Ct. 2009).


1.  Identification of Protectable Trade Secrets

Defendants argue that OptionMonster has not adequately identified its

protectable trade secrets.  Pursuant to ITSA, a trade secret is

> information, including but not limited to, technical or non-technical data, a
> formula, pattern, compilation, program, device, method, technique, drawing,
> process, financial data, or list of actual or potential customers or suppliers,
> that: (1) is sufficiently secret to derive economic value, actual or potential,
> from not being generally known to other persons who can obtain economic
> value from its disclosure or use; and (2) is the subject of efforts that are
> reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS § 1065/2.  OptionMonster has pointed out that the Services Agreement

states that the System "and all elements of the work-product developed pursuant to

the [Services] Agreement, including source code and all design documents and

business requirement specifications" belong to OptionMonster. (Sahoo Aff. Ex. A 23). OptionMonster has also pointed to the Services Agreement for the definitions of "Confidential Information," "Client Data," "Intellectual Property," and "Work Product." (Sahoo Aff. Ex. A 21–24). In addition, OptionMonster has identified its trade secrets as the System architecture, the user interface, the source code, and "know-how" related to the System. (P Mot. 3). Tavant characterizes such items as "broad areas of technology." (D Opp. 10). According to Tavant, for the purposes of the instant motion, OptionMonster should be required to point to the specific source code that has been misappropriated. However, such specificity is not required at this juncture.

Tavant also argues that OptionMonster's identification of trade secrets includes third party software and open source applications or information that is already in the public domain. Under Illinois law, trade secrets can include "a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *3M v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001)(citing *Syntex Ophthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 683 (7th Cir. 1983). While the record at this juncture indicates that OptionMonster identifies the use Flex and reverse push architecture as part of its trade secrets, the record also reflects that OptionMonster has listed source code, design documents related to account management, branch code, batch source code, business requirements, technology architecture, and project planning materials

16

as additional proprietary information and trade secrets. (Mueller Auth. Aff. Ex. 126). Therefore, OptionMonster's inclusion of third party software or information already in the public domain is not fatal to its ITSA claims.

### 2. Alleged Use of OptionMonster's Trade Secrets

Defendants argue that OptionMonster cannot show that Tavant used OptionMonster's trade secrets in doing work for Competitors.

#### a. Defendants' Prior Experience with Online Trading Platforms

Defendants argue that, prior to Defendants' work on the Project, Tavant already had significant experience with financial services applications, including the architecture, design, and development of stock trading platforms. The record at this juncture reflects that five Tavant employees who worked on the Project had such experience. (D Opp. SR Ex. SS 25-28). However, such evidence is not dispositive with respect to whether Defendants misappropriated OptionMonster's trade secrets, especially given that sixteen Tavant employees worked on the Project and have been named as Individual Defendants in the instant action.

#### b. Distinctions Between Components

Defendants argue that OptionMonster cannot show that Defendants misappropriated OptionMonster's trade secrets because the work Defendants did for OptionMonster was limited to the middle-office and back-end components of the

System, and, in contrast, the work Tavant has done for Competitors relates to the front-end component, or user interface. In support of their argument, Defendants point to Sahoo's affidavit, which indicates that OptionMonster "primarily used" a different vendor to develop the System's user-interface and that "[D]efendants did not have global access to all design and business requirement documentation for the 'front end' screens." (Sahoo Aff. Par. 10). The record at this juncture, however, shows that Tavant and OptionMonster entered into Terms of Engagement, which provided that Tavant would perform certain work on the front-end of the System. (D. Opp. SR Ex. A1-A7).

Defendants argue that the Terms of Engagement were not part of the Services Agreement, that most of the consultants engaged under the Terms of Engagement (Consultants) did not sign an Individual Agreement, and that therefore, the Consultants were not subject to the Services Agreement's prohibition related to performing work for Competitors. We first note that only one of the Individual Defendants was also a Consultant, and that the record at this juncture indicates that such Defendant signed an Individual Agreement. In addition, whether Consultants signed Individual Agreements is a separate issue from whether Defendants' work under the Services Agreement included work on the front-end of the System.

Further, the record at this juncture indicates that the Terms of Engagement were part of the Services Agreement. Sections 7.4 and 7.5 of the Services Agreement provide for certain work to be completed on a time and materials basis and the submission of invoices related to that work. (Sahoo Aff. Ex. A 18-19).

Consistent with the provisions in the Services Agreement, the Terms of Engagement contemplate monthly invoicing for any work performed. (D. Opp. SR Ex. A1-A7). The record also indicates that the work performed under the Terms of Engagement was done in both Chicago and Bangalore. (D. Opp. SR Ex. A2). In addition, when Tavant provided a list of the Project Staff to OptionMonster in April 2010, Tavant included Consultants as members of the Project Staff. (Mueller Aff. Ex. B). Thus, the record at this juncture indicates that the Terms of Engagement were part of the Services Agreement and that Defendants performed work related to the front-end component of the System under the Services Agreement.

### c. Differences in Work on the Project and Work for Others

Defendants argue that they have produced information related to projects done for Competitors and that OptionMonster has not pointed to any specific evidence showing that Defendants misappropriated OptionMonster's trade secrets. Defendants also state that OptionMonster has declined to do a source code comparison at this juncture. Defendants contend that there is therefore no evidence that Defendants misappropriated OptionMonster's trade secrets. However, the record shows that ten former Project Staff worked on the MB Trading Project, eleven former Project Staff worked on the ChoiceTrade project, two former Project Staff worked on the TradeKing project, and eight former Project Staff worked on the Scotia project. (D. Opp. SR Ex. SS 7-11). The record also reflects that some former Project Staff worked on the same parts of the Competitors' trading system as they

did on the Project. (D. Opp. SR Ex. SS 14-17). In addition, the record indicates that during the audit, OptionMonster found that Tavant had failed to delete or destroy, among other materials, OptionMonster's recent source code, design documents related to account management, branch code, batch source code, business requirements, technology architecture, and project planning materials. (Mueller Auth. Aff. Ex. 126). Thus, Defendants' argument that there is no evidence of trade secret misappropriation lacks merit.

### d. Audits

Defendants argue that they took the required steps to maintain the confidentiality of OptionMonster's trade secrets by segregating the Project on a separate floor of a building (Project Area) and restricting access to the Project Area during the development of the System. (D Opp. SR Ex. SS 18-20). Defendants also state that after the System went live, OptionMonster approved the desegregation of the Project Area even though certain Tavant employees still provided support services related to the System. (D Opp. SR Ex. SS 18-20). In addition, Defendants contend that to protect the confidentiality of the Project, Tavant maintained dedicated workstations, servers, and a local area network. (D Opp. SR Ex. SS 18-20). Defendants also state that OptionMonster conducted between six and twelve audits during the course of the Project and did not have any problems or concerns related to the confidentiality of their trade secrets. (D Opp. SR Ex. SS 18-20). Defendants also point to affidavits provided by employees indicating that Defendants did not use

OptionMonster's code or other information in Defendants' work for Competitors. (D Opp. SR Ex. F, G, H, I, J, K, II, JJ, QQ).

The record indicates that OptionMonster became concerned that Defendants had misappropriated OptionMonster's trade secrets in December 2009, and that when OptionMonster felt its confidentiality concerns were not being adequately addressed, OptionMonster informed Tavant that work being performed at the facility in Bangalore should be shut down. (Sahoo Aff. Par. 51, Mueller Aff. Par. 38-39, Mueller Auth. Aff. Ex. 110). As discussed above, OptionMonster has pointed to portions of the record showing that OptionMonster conducted an audit of the Bangalore Facilities from April 13-15, 2010, and that at that time OptionMonster found confidential and proprietary information on a dozen computers assigned to employees who had previously worked on the Project. (Mueller Auth. Aff. Ex. 126). OptionMonster has also made specific allegations and pointed to evidence related to Individual Defendants' downloading of and use of OptionMonster's trade secrets after Individual Defendants had completed work on the Project. (Sahoo Aff. Par. 55, 57, 58). Thus, OptionMonster has pointed to sufficient evidence to show a likelihood of success on its ITSA claims. We note, however, that "[a] preliminary injunction is intended to protect the status quo while the case proceeds, not to adjudicate the merits." *Chathas v. Local 134 Intern. Bros. of Elec. Workers*, 233 F.3d 508, 513 (7th Cir. 2000). After more extensive discovery has been conducted, OptionMonster will have to point to sufficient evidence to show that Defendants used OptionMonster's proprietary information and trade secrets to sustain its ITSA

claims.


## II.  Irreparable Harm/Inadequate Remedy At Law

Under Illinois law, there is a rebuttable presumption of irreparable harm in cases involving misappropriation of trade secrets.  *UTStarcom, Inc. v. Starent Networks, Corp.*, 675 F. Supp. 2d 854, 864 (N.D. Ill. 2009)(citation omitted); *See also Ultraviolet Devices, Inc. v. Kubitz*, 2009 WL 3824724, at *3 (N.D. Ill. 2009).

Defendants suggest that since all of OptionMonster's proprietary and trade secret information has now been deleted or destroyed and all Project Staff have been removed from projects being performed for Competitors, OptionMonster cannot show irreparable harm or an inadequate remedy at law.  Defendants also argue that if OptionMonster prevails on its ITSA claims, the statute permits OptionMonster to recover a reasonable royalty or actual loss, and that such recovery is sufficient to compensate OptionMonster in the instant action.  Defendants further argue that alleged loss of market share does not create irreparable harm.  Finally, Defendants argue that the Competitors have already been provided with the functionality that allegedly contains OptionMonster's trade secrets, and therefore the alleged trade secrets have already been disclosed.  Defendants claim that OptionMonster will not suffer future irreparable harm because Defendants have voluntarily agreed that for functionality not yet shipped to Competitors, Tavant will undo any work done by Project Staff and will redo work with other employees.

OptionMonster argues that Defendants' current compliance with the terms of

the Agreements cannot negate the effect of Defendants' past non-compliance. OptionMonster also contends that even though some delivery of products has already occurred, additional delivery which will irreparably harm OptionMonster is still scheduled to occur in the future. Further, with respect to the projects where some delivery has already occurred, OptionMonster argues that without a preliminary injunction, Defendants' continued work on such projects will do further harm to OptionMonster.

A party suffers irreparable harm when "a party cannot be made whole by a damages award at the conclusion of trial." *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 599 (7th Cir. 1984). Irreparable harm occurs in the context of trade secret misappropriation where the trade secret misappropriation results in the intangible loss of competitive advantage, customers, and goodwill. *Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763 (C.D. Ill. 2009). The record indicates not only that Defendants have delivered some products to Competitors, but that such products are still being tested in the production environment and will in the future be used to unfairly compete with OptionMonster. (Golvala Dec. Par. 3). Further, the record indicates that Tavant is scheduled to deliver additional products in the future. Thus, OptionMonster remains subject to future irreparable harm in the absence of a preliminary injunction. We also note that the Agreements provide that any breach would cause irreparable injury for which monetary damages would not be adequate, and that therefore OptionMonster would be entitled to injunctive relief under the Agreements. (Mueller Auth. Aff. Ex. 7-24 5; Sahoo Aff. Ex. A 23). Based upon the

above, Defendants have not rebutted the presumption of irreparable harm in this case.

III.  Balancing of Harms

In determining whether to grant a motion for a preliminary injunction, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086.  Defendants argue that the harm to Defendants is greater than the harm to OptionMonster because Tavant's trading practice comprises 25% of Tavant's business and a preliminary injunction would further damage Tavant's customer relationships, reputation, and ability to comply with contracts already in place. However, the record shows that the harm to OptionMonster is greater than the harm to Tavant because OptionMonster spent significant money and time in conceptualizing, designing, launching, and supporting the System.  (Mueller Aff. Par. 21).  In addition, the record shows that the System is unique and highly ranked. (Mueller Aff. Par. 14-20; Mueller Auth. Aff. 34, 37-40, 48, 93).  Based upon such facts, we find that the harm to OptionMonster outweighs the harm to Defendants.

IV.  Public Interest

Defendants have argued that a preliminary injunction will not only impact Tavant, but will impact Competitors waiting for the delivery of product or relying on

Tavant for system support. We note that such Competitors generally have pre-existing trading platforms that will not be affected by the issuance of a preliminary injunction in the instant action. In addition, any harm to Competitors is also mitigated by the fact that Competitors would likely be able to recover damages from Tavant. Finally, the public interest is well-served by enforcing valid contracts and protecting trade secrets. Therefore, based upon the above, we grant the motion for a preliminary injunction.

## V. Bond

Having concluded that Plaintiffs' motion for preliminary injunction should be granted, the court must determine the issue of bond. Pursuant to Federal Rule of Civil Procedure Rule 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Defendants have indicated that OptionMonster should be required to post $3,000,000.00 to cover the potential loss Tavant may suffer as a result of the preliminary injunction. However, pursuant to the Services Agreement, the parties agreed that a breach of confidentiality provisions, whether under Section 9 or otherwise, would entitle OptionMonster to injunctive relief without the need to post any bond. (Sahoo Aff. Ex. A 23). Having concluded that OptionMonster is entitled to injunctive relief based upon, in part, a breach of the confidentiality provisions by Defendants, and

after reviewing the Services Agreement, we conclude that no bond will be required of OptionMonster.

## CONCLUSION

Based upon the above, we grant OptionMonster's motion for a preliminary injunction.

Samuel Der-Yeghiayan
United States District Court Judge

Dated:   June 29, 2010